IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | |
|---|---|
| TOA TRADING LLC AND MUNSHIBARI LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MULLEN AUTOMOTIVE, INC. AND MULLEN TECHNOLOGIES, INC., <br><br> Defendants. | JURY TRIAL DEMANDED |

**COMPLAINT**

**INTRODUCTION**

1.  Plaintiffs TOA Trading LLC ("TOA") and MunshiBari LLC ("MunshiBari") (collectively "Plaintiffs") bring this action against Defendants Mullen Automotive, Inc. and Mullen Technologies, Inc. (collectively "Mullen" or "Defendants") for breach of contract or, alternatively, unjust enrichment. Plaintiffs' allegations are based on the investigation of counsel, and thus on information and belief, except as to the individual actions of Plaintiffs, as to which Plaintiffs have personal knowledge.

2.  This is a straightforward breach of contract case. In late May 2020, Plaintiffs introduced executives at Net Element, Inc. ("NETE") to executives at Mullen so that the executives could discuss a business combination. On June 12, 2020, NETE and Mullen agreed

1

to a reverse triangular merger.[1] On that same day, June 12, 2020, TOA and Mullen Technologies, Inc. entered into an agreement entitled "Finder's Fee Agreement" (the "Agreement"), under which Mullen Technologies, Inc. agreed to pay a finder's fee to Plaintiffs for their efforts in introducing executives at NETE to executives at Mullen, leading to the reverse triangular merger. Mullen agreed to pay Plaintiffs a finder's fee equal to be 3% of the total purchase price consideration at the closing of the merger, as follows: 50% to TOA (1.5%), 50% to MunshiBari (1.5%).[2]

3. The merger closed on November 5, 2021 and Mullen began trading on the NASDAQ under the ticker symbol MULN the same day. Despite the clear terms of the Agreement, requiring Mullen to pay a finder's fee at closing, Mullen has not paid Plaintiffs the finder's fee, and Defendants have indicated that they do not intend to pay the finder's fee. Defendants have therefore breached the Agreement, and unjustly retained the benefits of the reverse triangular merger facilitated by Plaintiffs without compensating Plaintiffs, as they agreed and as required by the Agreement.

4. Plaintiffs are entitled to damages and/or specific performance of the Agreement, including payment of 3% of the total purchase price consideration paid in connection with the merger.

5. Under applicable law, Plaintiffs are entitled to be placed in as good a position as they would have been if the Agreement had not been breached. As detailed below, absent the breach of the Agreement, Plaintiffs would have received at least 1,319,157 shares of common

---

[1] "A reverse triangular merger is a merger of a subsidiary corporation into a target corporation (which emerges as the surviving corporation) where shareholders of the target corporation exchange their stock for stock of the subsidiary's parent corporation." § 13:18. Reverse triangular merger, 1 S Corporations Federal Taxation § 13:18.

[2] The Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

stock of the surviving company (Mullen) on November 5, 2021, the date of the merger closing. On November 5, 2021, shares of Mullen closed at $11.77 per share. Therefore, the value of the shares to which Plaintiffs were entitled was over $15.5 million at the time of the breach of the Agreement. Plaintiffs are entitled to recover at least the full amount of this value in this lawsuit.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between Plaintiffs and Defendants and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs. As noted above, Plaintiffs are entitled to millions of dollars in damages.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the misconduct at issue took place and had effects in this District. Plaintiff TOA resides in this District, entered into the Agreement in this District, and was injured in this District.

8. Jurisdiction is also proper under Florida's long-arm statute, Fla. Stat. § 48.193(1), because Defendants breached a contract in Florida by failing to perform certain acts required by the contract to be performed in Florida. Thus, Defendants' liability arose in part in this District.

## PARTIES

9. Plaintiff TOA is a duly organized Delaware limited liability company with its principal place of business in North Miami Beach, Dade County, Florida. TOA is a credit card processing business and a consulting business.

10. Dayan Martinez is a resident of Florida and the sole member of TOA. Mr. Martinez signed the Agreement on behalf of TOA. Mr. Martinez, on behalf of TOA, helped facilitate the referral of NETE to Mullen, which led to the reverse triangular merger, as set forth

in more detail below. As a result, the Agreement expressly provides that 50% of the finder's fee compensation required under the Agreement was to be paid to TOA at the closing of the merger.

11. Plaintiff MunshiBari is a duly organized New York limited liability company with its principal place of business in New York, New York. The Agreement, which specifically provides that MunshiBari is entitled to 50% of the finders' fee, clearly manifests the intent to directly benefit MunshiBari for its role as a finder.

12. Dr. Shaheen Ahmad is a resident of New York and the sole member of MunshiBari. Dr. Ahmad is an entrepreneur, investor, consultant, technology developer, scientist and a former Professor of Electrical Engineering. Dr. Ahmad, on behalf of MunshiBari, helped facilitate the referral of NETE to Mullen, which led to the reverse triangular merger, as set forth in more detail below. As a result, the Agreement expressly provides that 50% of the finder's fee compensation required under the Agreement was to be paid to MunshiBari at the closing of the merger.

13. Defendant Mullen Technologies, Inc. is a California corporation with its principal places of business in Brea, California.

14. Defendant Mullen Automotive, Inc., is a California corporation and successor in interest to Mullen Technologies, Inc. Prior to the reverse triangular merger with NETE, Mullen Automotive, Inc. was a wholly owned subsidiary of Mullen Technologies, Inc. But, as explained in Amendment No. 1 to the Form S-4 Registration Statement dated July 22, 2021 ("Registration Statement"), Mullen Technologies, Inc. and Mullen Automotive, Inc. entered into a de facto

merger (which the Registration Statement referred to as a "reorganization"), just prior to the reverse triangular merger in order to facilitate the transaction with NETE:[3]

> Prior to the Merger Effective Time (as defined below), Mullen and Mullen Technologies will undergo the following transactions: (i) Mullen Technologies will assign and transfer to Mullen [Automotive] all of its electric vehicle business related assets, business and operations and (ii) Mullen [Automotive] will assume certain debt and liabilities of Mullen Technologies. Prior to the Merger, Mullen Technologies will spin off, via a share dividend, all of the capital stock of Mullen [Automotive] to the stockholders of Mullen Technologies as of the effective date of such spin off. After such spin off and immediately prior to the Merger effective time, the capital structure of Mullen [Automotive] (including its issued and outstanding Common and Preferred Stock) will mirror the capital structure of Mullen Technologies.

15.     In connection with the Mullen Technologies, Inc. and Mullen Automotive, Inc. "reorganization" that preceded the reverse triangular merger, Mullen Automotive, Inc. agreed to assume the liabilities of Mullen Technologies as set forth in the May 12, 2021 Contribution and Spin Off Agreement (attached as an exhibit to the Registration Statement).[4] Section 1.2 of that agreement provides:

> 1.2 Assumption of Liabilities. Effective as of the Effective Date, Mullen Automotive hereby assumes from Mullen Technologies and agrees to pay, defend, discharge and perform as and when due any and all liabilities accruing before May 12, 2021, and arising out of or relating to the Assets or the [Mullen Technologies electric vehicle] Business (the "Assumed Liabilities"), other than the Excluded Liabilities (defined in Section 1.3 below).

16.     The Agreement was entered into on June 12, 2020—nearly a year earlier than the Mullen "reorganization"—and is not an excluded liability under Section 1.3, which provides:

> 1.3 Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, Mullen Automotive will not assume or be liable for, and will

---

[3] Net Element, Inc., Amendment No. 1 to Form S-4 (July 22, 2021) at 1, https://www.sec.gov/Archives/edgar/data/0001499961/000143774921017321/nete20210713_s4a.htm

[4] See Exhibit 10.11 to Registration Statement, Contribution and Spin Off Agreement (May 12, 2021) https://www.sec.gov/Archives/edgar/data/0001499961/000143774921017321/ex_264039.htm.

5

have no responsibility related to, any liabilities accruing on or after the Effective Date, and arising from acts, omissions, or agreements occurring on or after the Effective Date, and which are not related to the Assets or the Business.

17. Mullen Automotive, Inc. is a mere continuation of Mullen Technologies, Inc. After the merger, Mullen Automotive, Inc. and Mullen Technologies, Inc. have the same corporate headquarters and same management team, with David Michery serving as CEO of both companies. Further, both companies refer to themselves as "Mullen." The Mullenusa.com website, which is a Mullen Technology, Inc. site (per the terms of use and the copyright mark appearing on homepage), states in the Q&A section that: "Mullen was incorporated in Brea, California in September 2014"; and that: "Mullen began trading on the Nasdaq Stock Market LLC ("Nasdaq") on November 5th, 2021. The milestone came in the wake of the company's stock-for-stock merger with Net Element Inc."[5] Defendants' common leadership, management team, headquarters and own use of the Mullen name to describe Mullen Technologies, Inc. and Mullen Automotive, Inc. interchangeably when describing the publicly traded company demonstrates that Mullen Automotive, Inc. is a mere continuation of Mullen Technologies, Inc.

## FACTUAL ALLEGATIONS

**A. The Finders' Fee Agreement**

18. Prior to the reverse triangular merger, NETE was a publicly traded company that focused on offering payment processing solutions to its customers. As discussed herein, in connection with the reverse triangular merger, the NETE corporate entity was renamed Mullen Automotive, Inc. *See* paragraph 41, below.

19. Plaintiff TOA was familiar with NETE because TOA also participates in the payment processing business and because Mr. Martinez did consulting work for NETE.

---

[5] See https://investors.mullenusa.com/resources (last visited January 4, 2022).

20.   In May 2020, NETE's CEO, Oleg Firer, asked Mr. Martinez if he knew of any companies interested in doing a transaction with NETE.

21.   Following up on Mr. Firer's request, Mr. Martinez came into contact with Dr. Ahmad, who, based on his business experience and knowledge as an entrepreneur, scientist and electrical engineer, was familiar with Mullen and its interest in becoming a public company.

22.   After becoming acquainted with Mr. Martinez, Dr. Ahmad sent Mr. Martinez a description of Mullen Technologies, Inc. and its subsidiaries, as well as certain financial forecasts for the subsidiaries. In turn, Mr. Martinez provided this information to Oleg Firer at NETE.

23.   This sequence of events is described in NETE's Registration Statement:

> On May 27, 2020, our CEO, Oleg Firer, received a forwarded email from Dayan Martinez of TOA Trading with an executive summary of Mullen Technologies, Inc. and its subsidiaries along with financial forecasts for said subsidiaries, with an emphasis on the subsidiary Smart 8 Energy as a potential merger opportunity for Net Element. That email was initially drafted by Dr. Shaheen Ahmad as introduction agent of Mullen and sent to Mr. Martinez.

24.   After forwarding the email on May 27, 2020 and participating in a phone call, where executives from NETE and Mullen introduced themselves to one another, no one from TOA or MunshiBari had any further role in the transaction. On June 12, 2020, the Agreement was executed. Mr. Martinez signed the Agreement on behalf of TOA, and David Michery, Mullen's CEO, signed the Agreement on behalf of Mullen Technologies, Inc.

25.   The Agreement was entitled "Finder's Fee Agreement," and TOA, Mr. Martinez's solely owned company, was listed as the "Finder."

26.   The Agreement provides:

> Mullen Technologies, Inc. ("Mullen") and TOA Trading. LLC ("TOA") agree as of June 12, 2020, that, in the event Mullen or an entity affiliated with, or created, or controlled by Mullen, enters into a merger, reverse triangular merger or sale

7

transaction with Net Element, Inc. ("NETE") to acquire all or a portion of the stock and/or all or a portion of the assets of Mullen (the "Company"), a fee shall be paid by Mullen to Finder in the stock of the surviving publicly trading entity at closing.

27. The amount of the finders' fee due under the Agreement at closing is 3% of the total purchase consideration.

28. Defendants acknowledged in the Agreement that the finder's fee was due at the closing of the reverse triangular merger because "Finder facilitated an introduction between Mullen and NETE on May 27, 2020" and as a "result of this introduction and the Finder's efforts Mullen and NETE have agreed on a binding letter of intent for a reverse triangular merger transaction."

29. The Agreement states that the finder's fee "will be calculated as follows:

Of total purchase price consideration: the sum of 3% to be paid at closing as follows:

50% to TOA Trading LLC, EIN # …(1.5%)

50% to MunshiBari LLC, EIN # …(1.5%)"

30. The Agreement did not require Plaintiffs to do anything else in order to be entitled to the finder's fee referenced in the Agreement.

31. Nevertheless, at the closing of the reverse triangular merger on November 5, 2021, Defendants did not pay the finder's fee to Plaintiffs. To date, Defendants have still not paid the finder's fee to Plaintiffs and have refused to do so despite multiple requests by Plaintiffs.

### B. Plaintiffs Were Finders, Not Brokers Or Dealers

32. The Agreement makes clear that all parties to the Agreement understood TOA's limited role in making the introduction made a "finder'" not a "broker" or "dealer." (A "finder" does not need to be registered as a broker or dealer.) Indeed, the Agreement was entitled

8

"Finder's Fee Agreement," with TOA identified as the "Finder." Likewise, by signing the Agreement, Mullen Technologies (and its CEO, Mr. Michery) expressly acknowledged that TOA was a finder, not a broker or dealer:

> The Finder is not a "broker" or "dealer" within the meaning of Section 3(a)(4) of the Securities Exchange Act of 1934, as amended (the "1934 Act") and is not required, nor by entering into this agreement or performing hereunder shall be required, to register as a broker or dealer under Section 15 of the act.

33. Likewise, MunshiBari was not a broker or dealer in connection with the reverse triangular merger, based on its limited role as "introduction agent." *See* Paragraphs 20-23, above.

34. Neither Plaintiffs nor Mr. Martinez or Dr. Ahmad are or were engaged in the sale of securities for the account of others in this matter. Specifically, they did not: (1) analyze the financial needs of Mullen (or NETE) in connection with a sale of securities; (2) recommend or design financing methods for the sale of securities; (3) become involved in negotiating the price or other terms of the merger or the sale of securities; (4) discuss the details of securities transactions; (5) make investment recommendations; or (6) become involved in the sale of NETE or Mullen securities for the account of others. In sum, neither Plaintiffs nor Mr. Martinez or Dr. Ahmad were engaged in or encouraged the sale of securities for the account of others, and thus had no obligation to register with the SEC as a broker or dealer.

35. Moreover, after forwarding the May 27, 2020 email described in Paragraph 23 above, and participating in a phone call, where executives from NETE and Mullen introduced themselves to one another, no one from TOA or MunshiBari had any further role in the transaction. They did not advise or consult with anyone as to the structure or merits of the deal, negotiate the transaction, or draft or sign the letter of intent or closing documents. Moreover, Plaintiffs are not regularly involved in mergers and acquisitions of companies through the

exchange of securities. Indeed, this transaction is the only time either Plaintiff has been involved in an introduction that led to a merger or acquisition involving securities.

### C. The Total Purchase Price Consideration Under the Agreement

36. As alleged above, the amount of consideration to which Plaintiffs are entitled under the Agreement as a finder's fee is 3% of the "total purchase price consideration," to be paid in the form of Mullen's publicly traded common stock at the merger closing.

37. The total purchase price consideration, and thus the amount of the finder's fee, can be determined by reference to documents describing the reverse triangular merger transaction.

38. The Second Amended and Restated Agreement and Plan of Merger dated as of July 20, 2021 ("Merger Agreement") is included as Annex A to the Registration Statement and describes the transaction in which NETE, a publicly traded company, formed a wholly owned subsidiary, Mullen Acquisition, Inc., to acquire the shares of the target company, Mullen Automotive, Inc., which was privately owned prior to the merger. This was a reverse triangular merger – one of the transactions expressly identified in the Agreement as triggering Defendants' obligation to pay a finder's fee.

39. In the Merger Agreement, NETE is referred to as "Parent," Mullen Acquisition, Inc., is referred to as "Merger Sub," and Mullen Automotive, Inc., a wholly owned subsidiary of Mullen Technologies, Inc., is referred to as "Company."

40. Section 1.01 of the Merger Agreement provides that Mullen Automotive, Inc. will be the "Surviving Corporation":

> at the Merger Effective Time, the Merger Sub shall be merged with and into the Company. As a result of the Merger, the separate corporate existence of Merger Sub shall cease and the Company shall continue as the surviving corporation existing under the laws of the State of California, shall become a wholly-owned

subsidiary of Parent and shall succeed to and assume all of the respective rights and obligations of Merger Sub and the Company (the "Surviving Corporation").

41. Section 1.04 of the Merger Agreement explains that in connection with the merger, NETE will amend its certificate of incorporation to allow it to authorize a sufficient number of new shares with identical rights afforded shareholders of Mullen Automotive, Inc., and to change its name to Mullen Automotive, Inc.:

> Parent shall amend its Certificate of Incorporation to (i) authorize a sufficient number of shares of three series of preferred stock of Parent with identical rights, preferences and privileges currently afforded holders of Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock of the Company (upon the Parent Board's designation of such new series of preferred stock, such stock shall be referred to as "Parent Series A Preferred Stock," "Parent Series B Preferred Stock" and "Parent Series C Preferred Stock") and (ii) change its name to "Mullen Automotive, Inc." (the "Parent COI Amendment");

42. Section 2.01(a) of the Merger Agreement explains that all Mullen Automotive, Inc. shares will be cancelled and exchanged for NETE shares and that the shares the Mullen Automotive, Inc. shareholders will receive as consideration is referred to as "Underlying Parent Common Stock":

> (all issued and outstanding shares of Company Common Stock, Company Series A Preferred Stock, Company Series B Preferred Stock and Company Series C Preferred Stock being hereinafter collectively referred to as the "Company Shares") issued and outstanding immediately prior to the Merger Effective Time (other than any Company Shares to be canceled pursuant to Section 2.01(b) and any Dissenting Shares) shall be canceled and shall be converted automatically, subject to Section 2.02, into the right to receive that number of shares of Parent Common Stock, Parent Series A Preferred Stock, Parent Series B Preferred Stock and Parent Series C Preferred Stock, as the case may be (collectively the "Parent Shares"), as set forth and further described on Schedule A hereto, the number of shares of Parent common stock to be issued to holders of Company common stock and issuable upon conversion of the Parent Series A Preferred Stock, Parent Series B Preferred Stock and Parent Series C Preferred Stock and exercise of the Current Noteholder Warrants and any other warrants and/or notes issued at or prior to the Merger Effective Time by Mullen or any of its Affiliates to any Person (including, without limitation, to Acuitas and any other investor into the Company Series C Preferred Stock) and assumed or to be assumed upon or after the Merger by Parent to be known as the "Underlying Parent Common Shares")…

11

43. The Merger Agreement also provides that post-merger capitalization of the surviving company will not exceed 75 million shares of common stock and that the Mullen Automotive, Inc. shareholders will receive 85% of the stock in the surviving company, while former NETE holders will not hold more than 15% of the shares:

> It is intended that the number of shares of Parent Common Stock outstanding immediately after the Merger Effective Time on a fully diluted and fully converted basis (the "Post Merger Capitalization") shall not exceed 75,000,000. As referenced in Section 2.10 herein, it is intended that 15% of the Post Merger Capitalization be allocated to the persons that hold shares of Parent Common Stock immediately prior to the Merger Effective Time (the "Parent Pre-Merger Stockholders") (subject to upward adjustment as set forth in Section 2.01); Parent shall take all commercially reasonable efforts to ensure that the number of shares of Parent Common Stock outstanding immediately before the Merger Effective Time on a fully diluted and fully converted basis does not exceed 11,250,000…
>
> \*\*\*
>
> For purposes of this Agreement, the aggregate number of Underlying Parent Common Shares issuable pursuant to the Merger plus the Escrow Shares shall constitute 85% of the total number of issued and outstanding shares of Parent Common Stock on a fully-diluted and converted basis immediately after the Merger Effective Time (the Parent Pre-Merger Stockholders to own 15% of the total number of issued and outstanding shares of Parent Common Stock on a fully-diluted and converted basis immediately after the Merger Effective Time). For purposes of determining the aggregate number of Underlying Parent Common Shares and Escrow Shares issuable pursuant to the Merger, Parent will cause its transfer agent to provide, on the day prior to the Merger Effective Time, a list of the then outstanding shares of Parent Common Stock on a fully-diluted and converted basis. For purposes of determining the number of outstanding shares of Parent Common Stock on a fully-diluted and converted basis prior and/or after to the Merger Effective Time, the parties shall include all shares of Parent Common Stock issuable upon exercise or conversion of outstanding warrants, options or other convertible securities of Parent outstanding immediately prior to the Merger Effective Time plus, for purposes of determining the number of outstanding shares of Parent Common Stock on a fully-diluted and converted basis immediately after to the Merger Effective Time, the Underlying Parent Common Shares and the Escrow Shares.

Thus, the total purchase price consideration for the reverse triangular merger is the aggregate number of Underlying Parent Common Shares of NETE plus the Escrow Shares issuable to Mullen shareholders pursuant to the Merger Agreement to acquire

Mullen, which constitutes 85% of the total number of issued and outstanding shares of the surviving company common stock on a fully diluted and converted basis immediately after the Merger Effective Time.

44. All of the conditions for the closing occurred and the merger was consummated. The surviving company is Mullen Automotive, Inc. and as of November 5, 2021, the company's shares began trading on NASDAQ under the ticker symbol MULN and, at the time of the filing of this action, continue to do so.

45. On November 9, 2021, Mullen issued a press release announcing the completion of the merger and reporting on the total number of shares that Mullen claims were exchanged as consideration in the transaction:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, announces today that its reverse merger transaction with Net Element is now complete. The combined company will operate under the name Mullen Automotive, Inc. The shares of Mullen Automotive now trade on the Nasdaq Capital Market under the ticker symbol "MULN."
>
> Pursuant to the closing of the merger, there are 51,173,640 million shares issued and outstanding on a fully diluted basis, all of Mullen Automotive's outstanding common and preferred shares were exchanged for Net Element common and preferred stock; an aggregate of 43,971,895 million shares which represents 85 percent of the combined company, were allocated to holders of common stock, preferred stock and reserved for issuance under outstanding warrants. A Current Report on Form 8-K containing more detailed information regarding the merger transaction and the allocation of shares to the holders of common stock and preferred stock and those issuable upon exercise of outstanding warrants will be filed with the Securities and Exchange Commission.[6]

46. Assuming the press release is accurate, then Defendants would owe a finder's fee of at least 1,319,157 shares of common stock of the surviving company (3% of the 43,971,895

---

[6] See November 5, 2021 press release (last visited January 4, 2022) http://news.mullenusa.com/mullen-issues-letter-to-shareholders-on-merger-completion

shares allocated to the pre-merger holders of Mullen stock in order to consummate the reverse triangular merger.)

47. According to the Agreement, the finder's fee of 3% of the total purchase price consideration was due to be paid to Plaintiffs at the time of the merger closing in the form of Mullen's publicly traded common stock. Defendants have not paid the finder's fee, despite the fact that the closing has already taken place.

48. Under applicable law, Plaintiffs are entitled to be placed in as good a position as they would have been if the Agreement had not been breached. As detailed above, absent the breach of the Agreement, Plaintiffs would have received at least 1,319,157 shares of common stock of the surviving company (Mullen) on November 5, 2021, the date of the merger closing. On November 5, 2021, shares of Mullen closed at $11.77 per share. Therefore, the value of the shares to which Plaintiffs were entitled was over $15.5 million at the time of the breach of the Agreement. Plaintiffs are entitled to recover at least the full amount of this value in this lawsuit.

49. Plaintiffs have demanded that Defendants honor the Agreement and pay the agreed-to finders' fee, but Defendants have refused, in breach their contractual obligation.

## COUNT I – BREACH OF CONTRACT

50. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

51. The Agreement is a valid and binding contract.

52. Plaintiffs performed their obligations under the Agreement.

53. Defendants breached the Agreement by failing to pay the amount owed to Plaintiffs under the Agreement.

54. As a direct and proximate result of Defendants breach of the Agreement, Plaintiffs have suffered and will continue to suffer damages.

## COUNT II – UNJUST ENRICHMENT

55. Plaintiffs incorporate by reference the allegations in the above paragraphs 1 through 49 as if fully set forth herein.

56. Plaintiffs conferred a benefit on Defendants by introducing Defendants and NETE, which led to them entering into a reverse triangular merger.

57. Defendants have knowledge of the benefit that was conferred on them by Plaintiffs' introduction, and as evidence of the benefit, entered into the Agreement to compensate Plaintiffs for the work that was done and for the introduction that was made.

58. Defendants have completed the merger and have thus voluntarily accepted and retained the benefit of the introduction and the opportunity that was provided to them by Plaintiffs.

59. The benefit was extremely valuable to Defendants, as they completed the merger that would not have been possible without the work and introduction that Plaintiffs provided to Defendants.  It would be inequitable for Defendants to retain the benefit without paying the value of this benefit to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A. Plaintiffs be awarded damages, pre-judgment and post-judgment interest;

B. Plaintiffs be awarded their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C. Judgment be entered in favor of Plaintiffs against Defendants, including interest thereon; and

D. For such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: April 8, 2022

Respectfully submitted,
*/s/ Manuel J. Dominguez*
Manuel J. Dominguez (Fla. Bar No. 0054798)
COHEN MILSTEIN SELLERS
 & TOLL PLLC
11780 U.S. Highway One
Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
jdominguez@cohenmilstein.com

Barry Taus (*pro hac vice* motion forthcoming)
Kevin Landau (*pro hac vice* motion forthcoming)
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
btaus@tcllaw.com
klandau@tcllaw.com

John P. Zuccarini (*pro hac vice* motion forthcoming)
THE LAW OFFICES OF JOHN P. ZUCCARINI
6880 SW 126th Terrace
Miami, FL 33156
Telephone: (248) 672-3325
zuccarinijp@gmail.com